November 15th, 1865.

# SUPREME COURT.

### R. E. WAKEMAN *vs.* KALAMA HAKALELEPONI.

A PAROLE agreement to take charge of a plantation for three years, alleged to have been made with the plaintiff by the defendant's agent, the latter to find all monies, required to carry on the business, said monies to bear interest from date of payment, and at the end of the three years, the sums advanced and interest to be paid back to defendant, plaintiff receiving one-half of the balance of receipts as his wages: Held to be an agreement not to be performed within a year and, therefore, such as the statute of frauds (Sec. 1053, Civil Code) declares invalid to found an action upon at law. unless it be in writing, etc.

Such an agreement, unattested by any writing signed by the plaintiff, can not

form a ground of defence to a suit for services rendered, based on a *quantum meruit.*

The defendant who, with every opportunity for observing the mode of cultivation pursued by the plaintiff upon the estate, which is shown to be unprofitable, retains him in employ for a long period, can not resist his claim for *some* wages on the ground of inefficiency.

Held; that by permitting the plaintiff to remain for such a length of time, he accepted his services such as they were, their value to be measured as nearly as possible by the nature and extent of the services rendered.

Judgment of the Court per Justice DAVIS. Referred to the Court without the intervention of a jury, by consent of both parties.

The plaintiff in this action claims of the defendant the sum of $3,237 for work and labor performed in and upon a certain plantation called the "Kaneohe Plantation," on the Island of Oahu, at her special instance and request, and for divers materials provided for the use of said defendant in and about the said plantation. Under a further count the sum of $327 30 is claimed for monies paid out and expended by the said plaintiff for the use of said defendant, for the business of the aforesaid plantation. The complaint sets forth that the services rendered, extend over a period from on or about the 8th day of September, 1862, to the 20th day of April, 1865.

The defendant answers by a plea of the general issue to the allegations of services performed by the plaintiff, and also by a special plea denying any authority or request to the plaintiff to pay out or expend the sum of $327 30 for her use, and on the contrary avers that she has committed to the plaintiff, since the 1st of November, 1862, a large sum of money, amounting to many thousand dollars, exceeding ten thousand dollars, to be expended on the Kaneohe Plantation.

At the hearing plaintiff's counsel admitted receiving from defendant cash amounting to $8475 60, but which had been disbursed for the plantation, besides a further sum of $249 39. It was also admitted by defendant's counsel that the account rendered by the plaintiff showed the money actually expended for disbursements of the plantation as therein set forth.

In support of the claim for services performed, the plaintiff produced a number of witnesses to the effect that they had seen the plaintiff engaged on the plantation at Kaneohe, from

the latter portion of the year 1862 till about March or April of the year 1865, as an overseer or superintendent of the plantation, having a number of native hands, 20 or 30, employed under him; that his first work was the putting up of buildings, then the cultivation of rice, raising two crops; that subsequently he commenced the cultivation of sugar, about 100 acres of cane being planted, according to one witness, between August 1863 and January 1864, with the exception of 10 acres planted previous to the first named date, in a field on the side of the road, mauka—said field containing about 30 acres.

It was testified also by Mr. Wilder, a witness who has been engaged in the business of sugar planting for four years, and who is at present proprietor of a sugar plantation at Kualoa on the windward side of this island, that $100 per month with a house and ordinary expenses paid, is a good price for an overseer, and that he should be an efficient man to merit such a compensation; that he has employed on his estate 150 men and women, and had 200 acres of cane under cultivation. Other witnesses testified that larger sums had been paid or offered to competent parties on more extensive plantations than the present, where large numbers of laborers, from 140 to 160, are employed, and large tracts are under cultivation, and in instances where other duties, such as that of engineer or sugar boiler during the season, were added to that of ordinary overseer or manager. Fifty dollars ($50) with house rent and other expenses, such as beef and vegetables raised on the plantation, was mentioned as having been recently paid to the overseer on the plantation of Kaalaea, in the neighborhood, who is represented as being an industrious man.

By the testimony of C. C. Harris, sworn for the defendant, it appears that the plaintiff went on to the plantation at Kaneohe in the latter part of October, 1862, that he, Harris, was to act as agent for this defendant in the management of a large amount of personal property belonging to her, and likewise to conduct and manage her estate at Kaneohe, it being the intention at first to establish a rice plantation, and testified also, that an agreement was made with the plaintiff to the effect that he was to take charge of the plantation for three years next succeeding November, 1862, the defendant's agent to find the neces-

sary funds, all amounts bearing interest from the date of pay-
ment.   At the expiration of the agreed term, the plaintiff was
to receive for his services one-half of the balance of the receipt
of the products of the estate after payment of the sums ad-
vanced and interest thereon.

At the trial, plaintiff's counsel objected to any evidence being
received touching the above agreement, as such an agreement
by its terms was contrary to the statute of frauds, to the sound-
ness of which objection we shall presently advert.

The witness furthermore states that the cultivation of sugar
began in July, 1863, by the plaintiff, with no intention on the
part of defendant's agent of starting a sugar plantation, not
even with his command, request or consent other than permis-
sion.   The cane was planted at first in patches, as it were, ex-
perimentally, and at the close of March, 1865, there were about
71 acres planted, not including a tract of 39 acres planted under
a contract by a third party.   The agent of the defendant claims
that all this work was done under the contract above stated by
him, with the most ample understanding and cordial co-opera-
tion of this plaintiff, as often admitted by him in presence of
witnesses ; in short that he was working on shares.   In the
latter part of 1864 and beginning of 1865, differences appear to
have arisen between the defendant's agent and the plaintiff as
to the outlay of any further expenses on the estate, the former
having expended a large sum, amounting at the close of 1862 to
$7,000 or $8,000—the laborers refusing to obey his, the defend-
ant's agent's, orders regarding work to be done in the fields.

On the 18th of March, 1864, a separate party was engaged to
superintend the mill-house by defendant's agent, and subse-
quently, the plaintiff stated to him he should not go back to the
place till a settlement was had with him, but that he was ready
to leave, if so desired by the defendant, and the result was that
the defendant's agent obtained a paper or authority in writing
from defendant giving the full control over the place, which on
being shown to plaintiff, he said he would not work under him,
the said agent, and finally quitted, and Joseph Emerson was em-
ployed on the 20th of April as overseer, but the testimony
shows that Wakeman was leaving for some time, as it were, and
by degrees before he left altogether, absenting himself from the

Wakeman *vs.* Hakaleleponi.

plantation, and leaving general orders with the laborers that they were to obey no commands from any other parties.

According to Emerson's testimony, the condition in which Wakeman left the plantation indicated bad farming, the fields were overrun with grass or sod, indigo, and castor oil plants, so that great labor was required to reclaim them and recover what cane had been planted, which was of very small size. The plowing or furrowing had been done in such an unskillful manner as to render irrigation difficult, if not impossible. Mr. Emerson's statements are corroborated by Dr. J. Mott Smith, who frequently visited the plantation during Wakeman's administration, who says also that he would not have invested a dollar with such cultivation as he saw on the plantation; heard Mr. Harris often remonstrate regarding the style of the work carried on, and that nothing was done as he, Harris, desired. There was no good prospect for a rattoon crop. Has heard Wakeman in conversation with defendant's agent, claim that he was a partner or share-owner in the sugar planting operation, but never asked for monthly wages. The comparison in the mode of cultivation, as between the present and former overseer, regarding the future, is much in favor of the present one, and bespeaks far better prospects for the plantation.

It therefore appears that the plaintiff's claim is resisted on two distinct grounds. First: That he embarked in the operation under a contract or agreement, that the remuneration he should receive was to depend, in effect, upon the success of the undertakings, to be derived either from the cultivation of rice, (or perhaps some other product to be raised on the estate) which was abandoned after a few months, and sugar growing entered into, mainly, by the defendant's showing at the instance of the plaintiff himself. If this be a valid and subsisting contract, the plaintiff has nothing now to receive, for the benefits from the rice did not pay expenses, and the sugar, up to time of plaintiff's quitting, has not been sufficient to yield any profit over the large outlays.

This position was conceded by the argument of plaintiff's counsel. But the plaintiff repudiates any such contract and bases his claim upon a *quantum meruit* for services rendered. And in reply to the latter, the defendant denies her liability to

make compensation for plaintiff's services, on the ground of their inefficiency and his want of proper cultivation, care and good management of the estate, which constitutes the *second*, and as we regard it, main ground of the defense.

The issue between the parties being so clearly developed upon the testimony and the pleadings, it remains for us to announce the conclusions to which we have been led by the testimony. As we regard the contract testified to by Mr. Harris, if valid, to be a bar to the plaintiff's claims, before proceeding further, it becomes necessary to adjudicate upon it. The statute referred to, and upon which plaintiff's counsel rests his objection is at Section 1053 of the Civil Code, under the caption, Chapter 20, " Of the prevention of Frauds and Perjuries in Contracts and in Actions founded thereon," and reads as follows :

" SECTION 1053.    No action shall be brought and maintained in any of the following cases ; *first*, to charge an executor or administrator upon any special promise to answer damages out of his own estate ; *secondly*, to charge any person upon any special promise to answer for the debt, default or misdoings of another ; *thirdly*, to charge any person upon an agreement made in consideration of marriage ; *fourthly*, upon any contract for the sale of lands, tenements, hereditaments, or of any interest in or concerning them ; *fifthly*, upon any agreement that is not to be performed within one year from the making thereof : unless the promise, contract or agreement upon which such actions shall be brought, or some memorandum or note thereof shall be in writing and be signed by the party to be charged therewith or by some person thereunto by him lawfully authorized."

Mr. Harris, the main witness to the alleged contract, expresses himself, while speaking of it, in these words : " Plaintiff agreed to take charge of the plantation for three years, next succeeding November, 1862, I to find all the money, and all amounts that I paid were to bear interest from date of payment ; at the end of three years the sums then advanced and the interest were to be paid back to defendant, and Wakeman was to receive one-half of the balance of receipts as his wages—the rest would be defendant's profits."    So that the agreement was not to be performed within a year.    It contemplated the embarking in an

Wakeman *vs.* Hakaleleponi.

enterprise which was not to be accomplished till the expiration of three years. At the end only of three years, says the witness, was there to be any settlement, then only the balance sheet was to be struck, outlays and interest repaid, and Wakeman to receive one-half of the balance of receipts as his wages. In the meanwhile it was a continuing engagement on the part of the plaintiff to go on and do the best on the estate for the benefit of both parties, and disbursements and receipts were to be wound up at the end of three years.

We regard this such an agreement as the Statute declares invalid to found an action upon at law, unless it be in writing and "signed by the party to be charged therewith, or by some person thereunto by him lawfully authorized." And we are also of opinion that such an agreement, unattested by any writing signed by the plaintiff, cannot form a ground of defense to the present action, or else it might very properly have been made the subject of a special plea in bar to the merits of a suit based as this is on a *quantum meruit.* Therefore the more serious question for us to consider is the ground of services. Have any been performed worthy of compensation? And if so, what is a fair valuation for them, as based upon the testimony, that the defendant should pay? As to the length of time that the plaintiff remained on the plantation there is no conflict worth considering. As to the exact degree and quality of the service alleged to have been performed, we regard the plaintiff's testimony as somewhat meagre. True, it appears he was the general overseer of the laborers, twenty or thirty hands. The land was uncultivated when he went on to the place; he worked it at first for rice, obtaining two crops, which Mr. Severance states amounted net to $1,219 11, with $827 58 to be added for a quantity sold to Mr. Prendergast, less cost of cleaning.

Then he planted sugar cane, as one witness testified, to the extent of 100 acres, but as defendant's agent states only to 71 acres, and this, from the particularity of his estimates of the areas of the different lots, we think to be more correct, and this in separate small lots; leaving the cane in such a state that no rattoon crop could be expected, and the entire plantation under such an imperfect condition of culture as to demand great labor for its future improvement from the incoming over-

seer. The whole proceeds of sugar and melado amounted to $4,618. Added to this, during the last months of plaintiff's incumbency, there was a want of that co-operation and accord between the defendant's principal agent and himself, which is so essential among the parties interested in the successful prosecution of any important undertaking, and which so far as the evidence tends, might be attributable to a failure of unanimity of purpose between the parties as well as to any neglect on the part of the plaintiff.

As to wages paid to overseers generally on the plantations, the evidence is sufficiently clear and explicit, but how far the Court can be guided by these prices, in a case like the present, is not, perhaps, so easy to determine.

If it be conceded that the plaintiff was merely employed on wages, and his administration unprofitable during the long period assigned by the defendant, it is somewhat surprising that he should have been retained so long without settlement and discharge by the agent of the defendant, or that the plaintiff should have been allowed to pursue a system of cultivation, which, long previous to his quitting, was showing itself to be disastrous. Although we might here remark, that daily experience demonstrates that agricultural operations of this nature, whether on a large or small scale, are seldom expected to be remunerative in the first two or perhaps three years. The receipts are not looked for to fully compensate the large outlays necessary to their commencement during this time, so that if the amount of compensation were to depend as under an agreement, as before stated, the plaintiff certainly could have nothing to receive, but would probably have something to pay over to the other party. And this is one reason why it is difficult for us to believe that these parties could have contemplated any settlement of gains, or even losses, as accruing at the end of the year, under the supposition that the agreement was from year to year, in order to bring it within the statute. That this plaintiff has not been the most efficient of overseers is unquestionable, but the Court would hesitate before dismissing his suit, as one entirely unworthy of any compensation whatever from the defendant's hands. He seems to have had her confidence sufficiently to entrust him with a very considerable

amount of her funds, through the hands of her agent, by whom it is shown that he plowed 71 acres of ground ; by another witness that he was engaged in the erection of buildings for the beginning of the enterprise, besides the subsequent planting of rice and cane, the latter not planted in a skillful or farmer like manner, but as to the rice there is no evidence before us but that the cultivation of that was good, although it did not yield a profit, a result, unfortunately, not unusual in this country in some agricultural enterprises. Added to this, Mr. Harris, the defendant's agent, was constantly visiting the plantation with every opportunity to observe, from time to time, the progress and manner of operation by Wakeman, and, for aught we perceive, might have interposed and instituted a more profitable system of cultivation, as he says he had all to do with the plantation ; from his testimony, we infer, as much so, as if it had been his own.

It is true, these points of the plaintiff's case are met by very reliable testimony, to show the neglectful manner in which the cane was planted and allowed to be overgrown, planted in such a way as in a great measure to lose the benefit of irrigation, and without prospect of any subsequent rattoon crop. This testimony has not been rebutted by the plaintiff. But the defendant's agent, notwithstanding these facts, kept the plaintiff in his employ, incompetent as he says he was ; continued to make large advances for Wakeman to disburse, until they became so large that he declined to go further. This retaining of the plaintiff in employ under all the circumstances of the case, which have been detailed, is the principal reason why we are of opinion that the defendant is put in a position, to be rendered liable for the payment of *some* wages to the plaintiff. He has, by permitting him to remain for so many months, accepted his services, such as they were. And therefore, whatever compensation the Court shall award him, should be measured as nearly as possible by the nature and extent of the service rendered as eliminated from the whole testimony produced on both sides.

From the view we take of this case, as above expressed, we have decided to award the plaintiff a compensation based upon a rate of wages much lower than the lowest wages mentioned

for an overseer, which we fix at $20 per month, for the time he remained at Kaneohe, say thirty months, being $600 and $59 balance due on his accounts as was admitted and agreed upon after the allowances were made between the counsel, with $56 for the articles sent over to the plantation, as we understood, with the knowledge of defendant's agent, making in all $715 with costs of suit.

Let judgment be entered accordingly for this amount and costs in favor of the plaintiff, as of the last day of the October Term.

R. H. Stanley, Esq., for plaintiff.

C. C. Harris, Esq., for defendant.